IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,901




 


CLEVE FOSTER, Appellant



v.



THE STATE OF TEXAS






APPEAL FROM CASE 0839040A OF THE

CRIMINAL DISTRICT COURT NO. 1

TARRANT COUNTY




 

 Hervey, J., delivered the opinion of the Court in which Keller, PJ., Meyers, Price,
Johnson, Keasler, Holcomb and Cochran, JJ., joined. Womack, J., concurred.


 

O P I N I O N



 In February 2004, a jury convicted appellant of capital murder. Tex. Pen. Code § 19.03(a). 
Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, sections 2(b) and 2(e), the trial court sentenced appellant to death. Art. 37.071, §
2(g). (1) Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises eighteen points
of error, many of which are challenges to the legal and factual sufficiency of the evidence. A brief
summary of the facts is helpful to address these points of error. We affirm.

STATEMENT OF FACTS

 The evidence shows that appellant and Sheldon Ward were close friends and were regulars
at a bar named Fat Albert's located in Fort Worth. On the night of February 13, 2002, appellant and
Ward were at Fat Albert's when Nyanuer "Mary" Pal, who was also a regular at Fat Albert's, arrived
there at around 9:00 or 10:00 p.m. The bartender testified that the three socialized and that toward
closing time Ward and Mary engaged in what the bartender called suggestive "dirty dancing." The
bartender testified that Ward had the most interaction with Mary during the evening and that at times
he, but not appellant, behaved inappropriately towards her. When the bar closed at 2:00 a.m.,
appellant, Ward and Mary walked out together. They talked in the parking lot for a few minutes. 
Mary left in her car followed closely by appellant and Ward in appellant's truck, which appellant was
driving. The bartender testified that appellant's truck was right on Mary's bumper, which the
bartender thought was unusual. (2) Approximately eight hours later at around 10:00 a.m., Mary's nude
body was discovered in a ditch "quite a ways off the road." Mary had been shot in the head, and
there was a wadded up piece of bloody duct tape next to her body. In the early morning hours of
February 15th, Mary's unlocked car, with her cell phone sitting on the front seat, was found in the
parking lot of the apartment complex where she lived.

 Subsequent DNA testing established that semen containing appellant's DNA was found
inside Mary's vagina and semen containing Ward's DNA was found insider her anus. Ward could
not be excluded as a minor contributor of semen found inside Mary's vagina.

 Q. [PROSECUTION]: Okay. In looking at the vaginal swab, I take it you did the
same testing on that?


 A. [DNA EXPERT]: I did.


 Q. Can you tell the jury what the results were?


 A. The profile obtained from the sperm fraction from the vaginal swab was a mixture
of a major male contributor and at least one minor contributor. The major
contributor, the profile was the same as [appellant]. And the minor contributor, I
could not exclude [Ward].


 Within a week of Mary's murder, the police investigation had focused on appellant and Ward
primarily because the police learned that they were seen following Mary out of the Fat Albert's
parking lot. On the evening of February 21st, the police arrived at a motel where appellant and Ward
shared a room (room 117) and spoke to appellant. Ward was not there. The police found various
items soaking in a cleaning fluid in a cooler in the back of appellant's truck. These items consisted
of three pairs of shoes, bungee cords, black gloves, a bicycle pump, a hatchet, a sheathed knife, two
slingshots, a trailer hitch, coat hangers, a brown strap, a bleach bottle, and a liquid detergent bottle. 
The State's DNA expert testified at trial that items soaked in cleaning fluids containing bleach could
make DNA recovery almost impossible. Appellant also directed the police to a dresser drawer in
the motel room that contained a gun that Ward had purchased from a pawn shop in August 2001. 
DNA testing established that the blood and tissue on the gun was Mary's. The police also found
bloody clothes in Ward's car. The blood on these clothes was Mary's.

 Appellant went to the homicide office on February 21st to provide a DNA sample. Appellant
was not under arrest at this time. (3) Appellant spoke to Detective McCaskill at the homicide office. 
McCaskill testified that appellant made several inconsistent statements during the February 21st
interview. Appellant initially denied that Mary had been inside his truck, he later stated that she may
have leaned inside it, and he ultimately stated that "they" went cruising but that "they" brought Mary
back to her vehicle at Fat Albert's. McCaskill testified that he did not believe this latter statement
about dropping Mary off at her vehicle at Fat Albert's after "they" went cruising because Mary's
vehicle was found outside her apartment. Appellant never admitted to having vaginal sex with Mary
during four separate interviews with McCaskill. (4)

 The police also obtained DNA samples from Ward, apparently some time on the night of
February 21st. The next day, Ward decided to move from the motel room that he shared with
appellant. Duane Thomas testified, as a rebuttal witness for the prosecution, that he was an
acquaintance of Ward's and that Ward called him in the early morning hours of February 22nd asking
if he could stay with Thomas. Thomas testified that Ward told him over the telephone that he was
in trouble because he had killed someone. Ward and appellant were at the motel room when Thomas
arrived there at about 2:00 or 2:30 a.m. on February 22nd to pick up Ward. Thomas testified that he
waited in his truck and saw appellant help Ward gather his bags but that Ward took them out to
Thomas' truck by himself. After they left, Ward told Thomas that he followed a girl home from a
bar, forced her into a truck at gunpoint, took her out to the country, raped her and blew her brains
out. Ward did not mention to his friend Thomas that appellant was involved in the offense or
anything else that would explain the presence of appellant's DNA inside Mary's vagina.

 Thomas eventually stopped at a store and "[got] the police" who arrested Ward. Detective
Cheryl Johnson testified that Ward gave an audiotaped statement to the police at 7:30 a.m. on
February 22nd. In this statement, Ward told the police a somewhat different story than the one he
told his friend Thomas a few hours before. Ward told the police that he was drinking heavily and
using cocaine on the night of the offense. He stated that he and Mary made arrangements to meet
up after Fat Albert's closed. According to Ward, after Fat Albert's closed, he and appellant went
back to their motel room where appellant "pretty much passed out" on the bed. Ward drove alone
to Mary's apartment complex in appellant's truck and picked Mary up. (5) Ward claimed that he and
Mary had consensual vaginal and anal sex on the front seat of appellant's truck, and that they drove
to the motel room where they had consensual vaginal sex. Ward and Mary left the motel and drove
around "a little bit." Ward next recalled standing over Mary's body lying on the ground with a
gunshot wound to her head and the gun in his hand. Ward did not remember firing the gun. Ward
stripped Mary's body and left. He said that he dumped Mary's clothes in a dumpster the location
of which he could not recall. He stated that he put his bloody clothes in his car at the motel. Ward
also stated that just before he moved out of the motel room on February 22nd, he left appellant a
letter (6) apologizing to him for involving him. Ward also stated that he had told Thomas a few hours
before that he had sex with a girl and killed her.

 Detective McCaskill testified that Mary's nude body was found "quite a ways off the road"
in a ditch. He testified that Mary's body did not appear to have been in the location where it was
found for "more than a few hours."

 Q. [PROSECUTION]: Can you tell the jury the condition of this body that was
found?


 A. [MCCASKILL]: Yes, sir. She was nude. She was-she had what appeared to be
a gunshot wound to the head. She had long braided hair. She did not appear to have
been there for a long time. There was not a degree of deterioration or
decompensation [sic] or anything that I could notice. She didn't appear to have been
there probably more than a few hours.

 

 McCaskill testified that there "was no forensic evidence found in or on [appellant's] truck
that linked the victim [sic] to this crime." He opined that it was very unlikely that "a person could
shoot and kill another" and "not get something on them, and then take a body that is bloody from one
location to another and dump it and not get anything on their clothing or anything in their truck." 
He also testified that it was possible that only one person could have carried Mary's body where it
was found even though he was "very comfortable" with saying that two people carried her body to
the location where it was found.

 McCaskill believed that Mary's body was carried to the location where it was found after
Mary was shot elsewhere because there was no "blood splatter around the area."

 Q. [PROSECUTION]: And being at the crime scene and examining the crime scene
photographs, do you have an opinion as to whether or not [Mary] was shot as she lay
in that location [where she was found]?


 A. [MCCASKILL]: No, sir. I don't believe that she was.


 Q. Can you tell the jury why?


 A. Well, we typically would have seen a lot of blood splatter around the area. 
Because it was what appeared to be a close contact wound, there's what's referred
to as blow back. A shot that's fired from a centerfire handgun, a large-caliber
handgun, has quite a bit of actual muzzle blast, and it creates-the blast itself causes
quite a bit of damage which will cause flesh and bodily fluids to come back out. And
we would normally see that on the area, possibly the ground around there or on her
body itself. And we did not see that in this case.

 

 The medical examiner also testified that there would have been "a profuse amount of blood"
associated with Mary's gunshot wound.

 Q. [PROSECUTION]: If [Mary] had been found in the place she was shot, in other
words, lying on-if she had been lying on some dry leaves, dead leaves, and had also
been shot there, what kind of matter or blood would you expect to find around these
wounds?


 A. [MEDICAL EXAMINER]: This was, in fact, a rather devastating gunshot wound,
and the bullet had passed through the brain stem and blood vessels, so there would
be a profuse amount of blood there, I would suspect.


 Q. And would the path of the bullet have also expelled brain matter in the area or do
you have an opinion about that?


 A. Yes. Certainly there's a possibility but one can't say with certainty, but
frequently, with an explosive gunshot wound and increasing pressures and bleeding,
the blood and the brain matter frequently oozes out both from the entry gunshot
wound as well as the exit gunshot wound.

 

 The evidence also showed that Mary was five-seven and 130 pounds. Ward is roughly five-six and 140 pounds. Appellant is a big man, is roughly six feet tall and approximately 225 pounds.
McCaskill testified that he believed it possible "that two people might have carried [Mary's body]
out there."

 Q. [PROSECUTION]: Let me take you back to State's 24. Is there anything of
significance to you about how her body was lying?


 A. [MCCASKILL]: Yes, sir.


 Q. Tell us what that is?


 A. In particular, I considered her right arm here, and the way that she was lying with
that arm up, I considered the possibility that two people might have carried her out
there. One person carrying her feet, the other person carrying the arms, and they
might have just dropped her in that position.


 McCaskill also believed it significant that a Whataburger cup in good condition was found
"no more than 30 to 40 yards" from Mary's body because appellant had stated in one of his
statements to the police "that he would on occasion frequent Whataburger."

 Q. [PROSECUTION]: And if you can use a laser pointer to see if you see anything
of significance to you.


 A. [MCCASKILL]: Yes, sir. It's a Whataburger cup laying right there.


 Q. What's significant about that?


 A. Well, at the time it was taken, it appeared to me that that cup had not been out
there very long. It was not weathered or faded as if it had been out there for a long
time. I believed that it was at least a possibility that it could have been dropped by
one of the people or the person or persons responsible. I had to at least consider that.


 Q. Well, in light of the fact that [appellant], in his audiotaped statement, told you that
he would on occasion frequent Whataburger?


 A. Yes, sir. At the time that photograph was taken, I wasn't aware of that, but it
became, I believe, important later.


 Q. Do you think it's important now?


 A. Yes, I do.


 Q. Why is that?


 A. Because of what we just talked about. They frequented Whataburger and a
Whataburger cup was discarded near the body. It appeared not to have been there
very long.


 McCaskill also testified that appellant and Ward had a unique relationship and that appellant
was kind of a mentor to Ward.

 Q. [PROSECUTION]: Are you aware of the unique relationship that [appellant]
shared with [Ward]?


 A. [MCCASKILL]: Yes, sir.


 Q. He recruited him into the Army?


 A. Yes, sir.


 Q. Kind of a mentor to him?


 A. I believe so, yes.


 [DEFENSE]: Your Honor, I'm going to object to leading.


 [THE COURT]: Sustained.


 McCaskill also testified that Ward and appellant had been roommates in at least three
different places and that they did "practically everything together."

 Q. [PROSECUTION]: Was there anything of significance to you in the relationship
between [appellant] and Ward and all the different places they lived, and all the
different things they've done, and that they were seen together with Mary that night
and seen leaving, following her and yet [appellant] is going to admit that he was
cruising with her with [Ward] in the truck as well? Anything of significance about
that to you?


 A. [MCCASKILL]: Yes, sir. Only to that they seemed to me that they did practically
everything together.


 The bartender testified that she could not think of a time when she saw appellant without
Ward.

 Q. [PROSECUTION]: Did you ever see one without the other?


 A. [BARTENDER]: I cannot think of a time when I saw just one of them.


 The bartender also testified that appellant and Ward were in Fat Albert's again on Thursday,
February 14th, after Mary had been murdered.

 Q. [PROSECUTION]: What about [appellant] and [Ward], did you ever see them
again at Fat Albert's?


 A. [THE BARTENDER]: Yes, I showed up there on Thursday to Fat Alberts and
they were present.


 Q. And when you say Thursday, are you meaning Valentine's Day?


 A. Valentine's Day.


 Q. The day after you had last seen [Mary]?


 A. Yes, sir.


 Q. Or I guess actually the same day early morning hours?


 A. Yes, sir.

 

SUFFICIENCY OF THE EVIDENCE

 In points of error one, four, and seven, appellant complains of the trial court's failure to grant
his first motion for directed verdict made at the close of the prosecution's case-in-chief on the
murder, aggravated sexual assault and kidnapping elements of the offense. (7) In points of error two,
three, five, six, eight and nine, he complains that the evidence is legally and factually insufficient to
prove these elements. In evaluating the legal sufficiency of the evidence, we view the evidence in
the light most favorable to the verdict and then determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia,
443 U.S. 307, 316, (1979). In a factual-sufficiency review, we view all of the evidence in a neutral
light, and we will set aside the verdict if the evidence supporting it is too weak to support a finding
of guilt beyond a reasonable doubt, or, after weighing all of the evidence in support of and contrary
to the verdict, the contrary evidence is strong enough that the beyond-a-reasonable-doubt standard
could not have been met. See Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex.Cr.App. 2004).

 A person commits the offense of capital murder if he "intentionally or knowingly causes the
death of an individual" (8) and "the person intentionally commits the murder in the course of
committing or attempting to commit kidnapping, . . . [or] . . . aggravated sexual assault . . ." Tex.
Pen. Code §19.03(a)(2). Viewed in the light most favorable to the jury's verdict, the evidence
supports a finding that, during the eight hours from when Fat Albert's closed and Mary's body was
discovered, Mary was abducted from her apartment complex, sexually assaulted, murdered, and her
body was moved to the location where it was found. A jury could rationally find that appellant and
Ward abducted Mary from her apartment complex and sexually assaulted her. The presence of
appellant's DNA in Mary's vagina, the unusual manner in which appellant followed Mary out of Fat
Albert's parking lot, and Ward's statement to Thomas that Mary was forced into appellant's truck
support these findings.

 With regard to the murder, there is the evidence of appellant's and Ward's "unique
relationship" and the evidence that they did "practically everything together." There is also
McCaskill's testimony that he was "very comfortable" with saying that two people were involved
in moving Mary's body to the location where it was found. Additionally, appellant made several
inconsistent statements to the police, particularly regarding cruising with Mary and Ward, when he
initially stated she had not been in his truck, and the assertion that they returned Mary to her car at
Fat Albert's when her car was found at her apartment and the bartender testified that appellant and
Ward followed Mary from Fat Albert's. A jury could also infer appellant's consciousness of guilt
from the evidence regarding the items in the back of appellant's truck soaking in bleach, which
would make DNA analysis almost impossible. Finally, there is appellant's failure to admit to having
had vaginal sex with Mary in light of the DNA evidence establishing the presence of appellant's
DNA inside Mary's vagina.

 On this record, a jury could rationally infer appellant's involvement in Mary's abduction,
sexual assault, murder, and the disposal of her body. We, therefore, decide that the evidence is
legally sufficient to support appellant's conviction.

 Viewed even in a neutral light, the evidence is also factually sufficient to support the jury's
verdict. The evidence discussed in our legal sufficiency review is not too weak to support a finding
of guilt beyond a reasonable doubt. See Zuniga, 144 S.W.3d at 484 (question to be answered in a
factual-sufficiency review is: "Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt?").

 We also cannot conclude that the evidence contrary to the verdict is so strong that the
beyond-a-reasonable-doubt standard could not have been met. We initially note that the absence of
other forensic evidence connecting appellant to Mary's murder does not constitute contrary evidence. 
The contrary evidence in this record primarily consists of appellant's denials and portions of Ward's 
somewhat conflicting statements to Thomas and to Detective Cheryl Johnson taking sole
responsibility for the offense. But even under a factual-sufficiency analysis, an appellate court must
still afford "due deference" to a jury's determinations, and a jury could rationally conclude that the
truth was "sprinkled throughout" these statements which, considered with the other evidence
outlined above, rationally establishes appellant's guilt. See Johnson v. State, 23 S.W.3d 1, 9
(Tex.Cr.App. 2000) (factual-sufficiency review requires reviewing court to afford "due deference"
to jury's determinations); see also Zuniga, 144 S.W.3d at 483 (factual-sufficiency standard contains
various safeguards "to ensure that reviewing courts [are] deferential to the fact-finder"). In addition,
the contrary evidence actually presented to the jury at the guilt phase at trial provides no innocent
explanation about how appellant's DNA came to be inside Mary's vagina. Points of error one
through nine are overruled.

 In point of error ten, appellant claims that the evidence is legally and factually insufficient
to support the jury's affirmative answers to special issues one (future dangerousness) and two (anti-parties). (9) For special issues one and two, we apply the Jackson v. Virginia standard in determining
whether the evidence is legally sufficient to support each finding. See Alldridge v. State, 850 S.W.2d
471, 487 (Tex.Cr.App. 1991) cert. denied, 510 U.S. 831,114 S.Ct. 101, 126 L.Ed. 2d 68 (1993). We
do not conduct a factual sufficiency review of the future-dangerousness special issue. McGinn v.
State, 961 S.W.2d 161,169 (Tex.Cr.App. 1998). However, we do conduct a factual sufficiency
review of the anti-parties special issue under the Zuniga v. State standard. (10) 

 We first address the future-dangerousness special issue. At the punishment phase,
appellant's ex-wife testified that appellant became verbally and physically abusive when he found
out that she was pregnant. She testified that appellant on several occasions hit her head against the
wall during arguments, that appellant once tried to shove her out of the car while they were driving,
and that appellant assaulted her in front of their son.

 The prosecution presented evidence that appellant was involved in a robbery in 1984 during
which appellant placed a knife to the victim's neck and that appellant participated in a murder that
occurred in 2001 at the Canyons apartment complex in Fort Worth. The victim, Rachel Urnosky,
was found laying on her bed with a gunshot wound to the head. The police recovered a bullet from
Urnosky's pillow, which came from the gun seized from the appellant's motel room on February 21,
2002. The appellant admitted being in Urnosky's apartment with Ward for a sexual tryst, but
claimed that they left when Urnosky asked them to leave. 

 Dr. David Self interviewed the appellant and reviewed the police files regarding Mary and 
Urnosky, and concluded that the appellant had a high risk for future acts of violence. Dr. Self opined
that the appellant's high risk for future violence would be particularly true under the circumstances
of a life sentence with no parole eligibility for forty years because the appellant would have nothing
to lose by engaging in acts of violence. On this record, a jury could rationally have found that there
is a probability that appellant would commit criminal acts of violence that would constitute a
continuing threat to society. 

 With regard to the anti-parties special issue, we have held that the anti-parties special issue
is relevant when the jury is instructed under the law of parties. See Valle, 109 S.W.3d at 504. The
record shows that appellant met Ward when he recruited Ward into the army and acted as Ward's
mentor. Appellant elaborates on their relationship in his March 22, 2002, statement (see footnote
4):

 In early December of last year, Sheldon let me know he wanted to know what it felt like to
kill somebody. You know, he was really pissed off at Tara for taking his daughter away.
That just added fuel to the fire, I reckon. Somewhere around the first week or so in
December we met at Fat Alberts like we do normally. It was a custom for us to go there at
least two or three times a week. He said he had that itch. He was ready to go do something.
He was ready to go out and find out what it was like to take somebody's life. We went
cruising around town for a while. I didn't know he had a gun, but sometimes he would have
it on him and not say anything about it. We went to different apartment complexes just kind
of cruising around because I figured if we cruised around, he would just lose the urge. I told
him, I'm going to cruise over to the Canyons where I used to live because it was a cool place,
and I wanted to see if any of my friends were still there. . . . I went to Fort Hood the next
morning and came back about five days later. We were at the house on North Ridge and
Sheldon said, I got something to show you. We were in his room and he showed me a
newspaper clipping that was about a girl that had been shot, and he told me that he had his
first one. He seemed happily nervous.


 Appellant knew what Ward was capable of, and was with Ward the night of Urnosky's
murder and the night of Mary's murder. Appellant and Ward shared a motel room and were hanging
out at their usual spot, Fat Albert's, the night they met Mary. Appellant and Ward left the bar in
appellant's truck following Mary. Appellant directed police to the drawer where the gun, that was
linked to Mary's death, was found. The police found shoes, bungee cords and other materials
soaking in cleaning fluid inside an ice chest in appellant's truck. Ward's DNA was found on the anal
and vaginal swabs and appellant's DNA was found on the vaginal swab. The evidence supports a
finding that appellant and Ward acted together in their endeavors or that, at least, the appellant
should have anticipated Ward's conduct in shooting Mary after they sexually assaulted her. We
cannot conclude that the jury's affirmative answer to the anti-parties special issue is irrational or
clearly wrong and unjust. Appellant's tenth point of error is overruled. 

ADMISSION OF EVIDENCE

 Appellant complains in his eleventh point of error that the trial court erred in overruling his
motion to suppress evidence seized pursuant to search warrants. Appellant argues that the affidavits
did not establish probable cause to support the issuance of the warrants. A magistrate's decision to
issue a search warrant is reviewed under a deferential standard of review. Swearingen v. State, 143
S.W.3d 808, 810-11 (Tex.Cr.App. 2004); see also, Illinois v. Gates, 462 U.S. 213, 234-37 (1983). 
The Fourth Amendment requires no more than a substantial basis for concluding that a search would
uncover evidence of wrongdoing. Id. Appellant argues that even after granting the magistrate the
requisite deference, it is clear from the four corners of the affidavit that it failed to contain sufficient
facts to justify the issuance of a warrant.

 In reviewing the affidavit, it is clear that appellant and Ward were the last people seen with
Mary at Fat Albert's. Appellant and Ward followed Mary's car when they left Fat Albert's in
appellant's truck. Early the next morning Mary was discovered dead. Three witnesses positively
identified Ward and the appellant in a photospread. One witness provided police with a telephone
number for appellant, which was traced to a motel room in appellant's name. This same witness
said he played pool with appellant, Ward, and the victim that night, and that Ward stated he was
going to take "Mary" home with him and alluded that he was going to have sex with her. Outside
the motel room was the white pick-up truck, which Lemlin had already identified as the one driven
by appellant that evening. Given this information, we find that the magistrate had a substantial basis
for concluding that a search would uncover evidence of wrongdoing and that the affidavit contained
sufficient facts to support the issuance of the warrant. The trial court did not err in denying
appellant's motion to suppress. Appellant's eleventh point of error is overruled. 

 Appellant complains in his twelfth point of error that the trial court erred in overruling
defense counsel's motion to suppress appellant's audio-taped statement. Appellant argues that
Detective McCaskill (11) failed to obtain any waiver from appellant before obtaining his statement. 
Appellant claims that the statement fails to comply with Article 38.22, § 3(a), which requires various
procedural safeguards as conditions precedent to the admission of statements made as a result of
custodial interrogation. The State argues that Article 38.21, § 3(a), does not apply because appellant
was not in custody when he gave the statement. 

 A trial judge is the sole trier of fact at a suppression hearing and thus evaluates witness
testimony and credibility. We give great deference to the trial court's determination of historical
facts while reviewing the court's application of the law de novo. Torres v. State,182 S.W.3d 899,
902 (Tex.Cr.App.2005). We must view the evidence in the light most favorable to the trial court's
ruling when the trial court does not file any findings of fact. Id. When no such findings of fact were
made, we will assume that the trial court made implicit findings of fact that support its ruling, as long
as the findings are supported by the record. Id.

 During the pre-trial hearing on appellant's motion to suppress the audio-tape, Detective
McCaskill testified in regard to appellant's interview:

 Q. Where did you talk to him at the homicide office?

 

 A. In an interview room that was located off a hallway. I didn't speak to him in the open
office.

 

 Q: Can you describe for the judge what this interview room looks like?

 

 A: Well, it's about - - without the benefit of a tape measure, it's probably about ten by ten,
and there's just a desk, and then there's two chairs on either side of the desk. 

 

 Q: When you were speaking to Mr. Foster, was he handcuffed, belly-chained, have leg irons
on him, or anything like that?

 

 A: No, sir.


 Q: Was he allowed to get a drink of water if he'd wanted one?


 A: Yes, absolutely.


 * * * * * * * * * * * * * * * * * * * *


 Q: Did he ever - - was he allowed to go use the rest room if he wanted to?


 A: If he needed to, absolutely.


 * * * * * * * * * * * * * * * * * * * *

 

 Q: And when you sat down to speak to Mr. Foster in that interview room, did you Mirandize
him?

 

 A: Yes, I did. 


 * * * * * * * * * * * * * * * * * * * *


 Q: Approximately how much time did you spend talking to Mr. Foster - - defendant Foster
at that time, on this occasion?


 A: We started at about 7:14 p.m., and we would have finished at approximately ten o'clock,
or 2200, roughly. I didn't document the exact ending time but probably a little over three
hours.


 Q: And during that time, was the defendant under arrest?


 A: No.


 Q: Was he free to leave?


 A: Yes.


 Q: Did he ever ask to leave?


 A: No, sir.


 Q: When you got through talking to him, what happened? What did y'all end up doing?


 A: One of the uniformed patrol officers drove him back to the Great Western Inn.


 The record supports a finding that appellant was not in custody when he gave the statement. 
See Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). Appellant's twelfth point is
overruled. 

JURY ARGUMENT 


 In points of error thirteen through sixteen, appellant complains of improper jury argument. 
Permissible jury argument generally falls within four areas: (1) summations of the law; (2)
reasonable deductions from the evidence; (3) responses to the defendant's argument; or (4) pleas for
law enforcement. Dinkins v. State, 894 S.W.2d 330, 357 (Tex.Cr.App. 1995), cert. denied, 516 U.S.
832 (1995). When the trial court sustains an objection and instructs the jury to disregard, but denies
a defendant's motion for mistrial, the issue is whether the trial court erred in denying the mistrial.
Id. We review this issue under an abuse of discretion standard. Hawkins v. State, 135 S.W.3d 72,
77 (Tex.Cr.App. 2004). Only in extreme circumstances, where the prejudice is incurable, will a
mistrial be required. Id. We balance the following three factors outlined in Mosley v. State to
evaluate whether the trial court abused its discretion in denying a mistrial for improper jury
argument: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the
certainty of the punishment assessed absent the misconduct (likelihood of the same punishment
being assessed). (12) Id. Counsel is allowed wide latitude in drawing inferences from the evidence so
long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. Cantu v.
State, 871 S.W.2d 667, 690 (Tex.Cr.App. 1992), cert. denied, 509 U.S. 926 (1993). 

 In his thirteenth point of error, appellant complains that the trial court erred in failing to grant
a mistrial after the prosecutor told the jurors that defense counsel was advancing a theory that Mary 
was "nothing but a whore." The challenged portion is as follows:

 [THE STATE]: And the solicitude - and John is a sincere guy and I think he meant it. The
solicitude, though, that he showed for [Mary] really flies in the face of the defensive theory,
which means she is nothing but a whore.


 [APPELLANT]: Objection, Your Honor.


 [TRIAL COURT]: Sustained.


 [APPELLANT]: I would ask for the jury to be given an instruction to disregard.


 [THE COURT]: The jury will disregard the last statement by counsel. And when you're
instructed to disregard, it is as if it has not happened. That means you don't discuss it and
you don't talk about it, and you don't use it in your deliberations.


 [APPELLANT]: We feel that an instruction is insufficient to cure the harm. We would ask
for a mistrial at this time.


 [TRIAL COURT]: That's denied.


 [THE STATE]: They want you to believe that she had consensual sex on the same night
with two men she had just met.


 Here, the defensive theory was that Mary had consensual sex with appellant and Ward.
Therefore, while the term "whore" was not used by the defense, they painted a picture of Mary in
which the term "whore" would not be an unreasonable characterization of the defense's description
of Mary. In addition, any error or prejudice from the argument was cured by the trial court's
instruction to disregard. See Andujo v. State, 755 S.W.2d 138, 144 (Tex.Cr.App. 1988) (any injury
from improper argument is ordinarily obviated when the court instructs the jury to disregard the
argument). Appellant's thirteenth point of error is overruled.

 Appellant argues in his fourteenth point of error that the prosecutor misstated the testimony
of a forensic DNA analyst (Connie Patton). The challenged portion of jury argument is as follows:

 [THE STATE]: Remember Pat Gass, our crime scene officer who went out and picked up
the weapon with Mike Carroll? He told you that he took sections from the passenger seat
of the truck, and Connie, said, I got sections from the passenger's seat of the truck and
[Mary] could not be excluded as a potential contributor to the blood. 


 [APPELLANT]: I believe that's a misstatement of the evidence, Your Honor.


 [THE STATE]: And interestingly -


 [TRIAL COURT]: In what way, counsel?


 [THE STATE]: I'm sorry, Judge.


 [APPELLANT]: I don't believe she specified blood.


 [TRIAL COURT]: I am going to overrule the objection. The jury will remember the specific
testimony. 


 Officer Pat Gass testified that he found some apparent blood on the fabric in the headliner
and the seat fabric in appellant's truck, which he collected during his investigation but he did not
know what was done with the evidence. 


 The testimony of the DNA analyst (Patton) regarding the fabric from the truck is as follows:

 

 Q: [THE STATE]: Okay. Any of the materials that were taken from a vehicle, the truck,
headliner, the seat cover, anything like that, did any of those connect back to [Mary]?


 A: [PATTON]: The stain from the right front passenger seat, the profile was a mixture of at
least two individuals in which neither the victim or Mr. Sheldon Ward could be excluded as
a possible contributor.


 Q: Okay. You know from which vehicle that was taken?


 A: I do not know.


 Q: Okay. Anything from the headliner of the truck?


 A: Blood was not detected on that item.


 The appellant points out that Patton did not know from which vehicle the seat cover came,
but Officer Gass previously testified the seat cover came from the pickup truck. However, Detective
McCaskill testified that no forensic evidence was retrieved from the truck. In reviewing all the
testimony regarding the blood from the truck, we find that the State's jury argument is a deduction
of the combined testimony of Gass and Patton, but was a misstatement of the record based on
Detective McCaskill's testimony. Thus, the trial court erred when it overruled appellant's objection. 
However, we find the error harmless. There are three factors to consider when assessing the impact
of the harm arising from jury argument error under Rule 44.2(b) of the Texas Rules of Appellate
Procedure, for non-constitutional error: (1) severity of the misconduct, (the magnitude of the
prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the
efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the
misconduct (the strength of the evidence supporting conviction). (13)

 Here, the degree of misconduct was mild. The prosecutor concluded that the material tested
by Patton was from the truck because that was the material retrieved by Officer Gass, however
Patton testified that she could not remember where the material came from, therefore the statement
made by the prosecutor may be correct but was not in fact stated by Patton. The comment was not
reiterated or emphasized by the State and comprised a single sentence within the State's argument. 
As to the second factor, the trial court gave no curative instruction since it overruled appellant's
objection. Finally, the evidence was sufficiently strong absent the prosecutor's reference to the
Mary's blood in appellant's truck. The substance in the truck was not critically necessary to tie
appellant to the vehicle, since appellant was seen driving his truck as he followed Mary's car and
appellant admitted cruising with the victim the night of her death, in his truck. Given the mild nature
of the prosecutor's statement in light of the evidence as a whole, the error in the statement was
harmless. Appellant's fourteenth point of error is overruled. 

 Appellant argues in his fifteenth point of error that the trial court erred in failing to provide
an instruction to disregard after she sustained defense counsel's objection to the jury argument that
there was evidence that appellant sexually assaulted Mary after Sheldon Ward put a gun to her head. 
The challenged portion of the argument is as follows:

 [THE STATE]: Because stop and think for a second, okay. What was her last moments like,
[Mary's]? Was she scared when [Ward] jumped out of that truck, put that gun to her head,
made her get in the floorboard, and he drove to that old country road? Was she begging for
her life as Sheldon Ward anally raped her, was she saying, please, don't hurt me?

 And as Cleve Foster began to sexually assault her, rape her vaginally, was she saying,
please, just don't kill me, please, just don't do that?

 

 [APPELLANT]: Objection, Your Honor, nothing in the record.


 [TRIAL COURT]: Sustained.


 [APPELLANT]: I would ask for an instruction for the jury to disregard.


 [TRIAL COURT]: Denied.


 [APPELLANT]: Motion for mistrial.


 [TRIAL COURT]: Denied.


 Appellant complains that the argument is outside the record because there is no evidence that
the appellant vaginally raped Mary after Ward put a gun to her head and anally raped her. The State
asserts that this argument does not point out who went first or second in sexually assaulting Mary,
but is only a plea for the jury to consider the terror and pain inflicted on Mary during each of the
sexual assaults. We find that the State's argument is a reasonable deduction from the evidence and
a plea to the jury to consider the circumstances of this crime. Furthermore, any error is harmless
because it did not matter who raped her first; there is evidence that both of them raped her. 
Appellant's fifteenth point of error is overruled. 

 In appellant's sixteenth point of error, appellant contends that the trial court erred by
overruling defense counsel's objection when the prosecutor argued to jurors that there can never be
enough mitigating evidence to justify a no answer to the third special issue. The contested part of
the argument is as follows:

 [THE STATE]: And I expect, when you look into your heart of hearts, you'll understand that
while there may be some evidence that -- no one has tried to say that this person is utterly
worthless, but you must remember the evidence of mitigation must be sufficient, must be
enough. Enough. How is there ever enough? How is there ever enough? That's no more
Christmas, empty seat at the birthday table.


 [APPELLANT]: Objection, Your Honor, counsel's argument is attempting to nullify the jury
instructions and get them to disregard their duty as jurors by saying there is never enough
mitigation evidence.


 [TRIAL COURT]: Overruled.


 [THE STATE]: In this case, under the evidence, there is not enough, I suggest to you. 


 We find that the State did not abuse its discretion in overruling appellant's objection. We
also find that while the initial argument made by the State may have been broad, the State's later
argument, "[i]n this case, under the evidence, there is not enough," directs the jury to consideration
of this specific case. The mere fact that the state argued that the jury should find the evidence
insufficient to answer "yes" to the mitigation instruction is not a nullification argument asking the
jury to ignore the trial court's instruction. Therefore, we overrule appellant's sixteenth point of error.

CONSTITUTIONALITY OF STATUTE

 In points of error seventeen and eighteen, appellant asserts that Article 37.071 is
unconstitutional because it impermissibly shifts the burden of proof on the mitigation issue to the
defendant. We have addressed and rejected this claim before, and appellant has given us no reason
to revisit the issue here. See Matchett v. State, 941 S.W.2d 922, 935 (Tex.Cr.App. 1996), cert.
denied, 521 U.S. 1107 (1997). Points of error seventeen and eighteen are overruled. 

 We affirm the judgment of the trial court.


 Hervey, J.


Delivered: April 12, 2006

Do Not Publish 


 

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of
Criminal Procedure.
2. The bartender testified that there was something unusual about how appellant followed Mary
out of the parking lot because one "couldn't put anything between the two bumpers."


 Q. [PROSECUTION]: You seemed to indicate that there was something unusual
about the way in which [appellant] and his passenger, [Ward], followed Mary. And
perhaps I missed it on my first go around. What did you find that was so unusual? 
You said something about almost having a wreck?


 A. [BARTENDER]: Well, you couldn't have put anything between the two bumpers. 
Going across this road, there's an intersection, you know, that's cut out so that you
can go west. There's a light there. You can't go nowhere. There's no traffic. So it
was just odd that she would be going into the road and they would be right on her
bumper. And it was just odd. It was odd for them to be together. It was odd for that
to be happening. 
3. Appellant was arrested for this offense in March 2002 after the DNA results came back.
4. In a March 22, 2002, written statement to the police, appellant claimed that Mary performed
oral sex on him at the motel room. This written statement, however, was not admitted into evidence
at the guilt phase of trial. It was admitted into evidence at the punishment phase. Appellant claimed
in this statement that he and Ward followed Mary to her apartment complex from where she
voluntarily went with them to the motel. Appellant stated:


 I laid down and started watching T.V. [Ward] and [Mary] were over there kissing and
making out on the bed. I wake up and I go to sleep. The next thing I remember that
she is giving me a blow job. I'm doing everything I can to wake up. Because if I'm
going to get fucked I want to enjoy it. I'd fall asleep and I wake up the same shit. 
The next thing I remember him telling me that he was going to take her home.
5. Appellant told McCaskill during the February 21st interview that Ward had not driven his
truck for more than two weeks. However, the murder occurred only one week prior to this date.
6. 

 Ward's audiotaped statement (Defense Exhibit 3) was played to the jury during the guilt
phase of trial. Ward's letter to appellant was not introduced at trial.
7. Appellant argues for the first time on appeal that we should not consider any evidence, which
would include Thomas' testimony, presented after the trial court denied this motion for instructed
verdict. We have, however, held that the denial of an instructed verdict motion is a legal sufficiency
challenge requiring a consideration of all the evidence. See Madden v. State, 799 S.W.2d 683, 686
(Tex.Cr.App. 1990). We, therefore, decline appellant's invitation not to consider any evidence
presented after the denial of appellant's motion for instructed verdict made at the close of the
prosecution's case-in-chief. 
8. 

 Tex. Pen. Code §19.02(b)(1); see also Tex. Pen. Code §19.03(a). 
9. 

 The anti-parties special issue required the jury to find "whether the defendant actually caused
the death of the deceased or did not actually cause the death of the deceased but intended to kill the
deceased or another or anticipated that a human life would be taken." Article 37.071, § 2(b)(2).
10. 

 See also Valle v. State, 109 S.W.3d 500, 504 (Tex.Cr.App. 2003) (finding that the anti-parties special issue is amenable to both factual and legal sufficiency review).
11. 

 Appellant's brief lists Detective Hardy as the detective who interviewed appellant. Detective
Hardy was present during the interview, however, Detective McCaskill is the detective who issued
the Miranda Warnings and who testified during the pretrial hearing regarding the motion to suppress
and during the punishment phase when the audiotape was played for the jury. Therefore, Detective
McCaskill will be referred to instead of Detective Hardy. 
12. 

 See Mosley v. State, 983 S.W.2d 249, 259 (Tex.Cr.App. 1998) (op. on reh'g); cert.
denied, 526 U.S. 1070 (1999).
13. 

 Threadgill v. State, 146 S.W.3d 654, 666-67 (Tex.Cr.App. 2004).